ANDREW N. SNOVER, appellant,

*v.*

LIZZIE PRALL and her husband, respondents.

A guardian who had taken his ward to live with him before the guardianship, agreed with his father, when he took her, that he would support her at his own cost and as his own child.    The ward appeared to have rendered whatever service she could in the family, and the guardian did not charge her for board in his books or in his first account.—*Held*, that he could not be allowed for her board, washing &c.

Appeal from decree of Warren orphans court.

*Mr. L. De Witt Taylor*, for appellant.

*Mr. G. M. Shipman* and *Mr. J. G. Shipman*, for respondents.

THE ORDINARY.

This is an appeal from a decree of the orphans court of Warren county, upon exceptions filed by Mrs. Prall to the final account of Mr. Snover, the appellant, as her guardian.    She lived with him in his family, as a member thereof, from the time she was about six and a half years old up to the time of her marriage, which took place in November, 1881.    She was then about twenty and a half years old.    The exceptions allowed were to the charges which the guardian made in his account for board of and for washing and mending for the ward, for the board of a dressmaker at his house employed by him to make dresses for her, for the services of his wife in sewing for the ward, for money paid for tuning a piano, and for counsel fee.

Snover v. Prall.

The ward went to live with the guardian before the letters of guardianship were taken out, and when she was, as before stated, about six and a half years old. She was his wife's niece, and her mother had then recently died. Her father testifies that there was an agreement between him and Mr. Snover, made before she went there, in reference to the terms on which the latter was to take her; that Mr. Snover said he would not take her unless he could assume parental guardianship over her, and his wife said so, too; that he told them he was reluctant to surrender her in that way, and that one of them said they would always give her a good home there; that they intended to take her as their own child (they then had none) and treat her as such. He says that at first he did not like to give her up, but saw that he could not do better; that she would have as good a home there as he could provide for her; that he gave her up to Mr. Snover then, and the latter said that he did not intend to make any charge for her keeping; that her work would be pay for it, and that her mother had left clothes enough to clothe her for some time. He says that this was shortly after her mother's death. He also testifies that he visited Mr. Snover about 1876 or 1877; that the latter then told him he had all her property yet, and that he had not used it, and had not made and did not intend to make any charge against her. It appears that the witness had, for the benefit of his two children, executed a deed of trust to Mr. Snover, as trustee, of certain property which he and his wife owned jointly at her death, and that the property was sold by Mr. Snover under the authority of the deed. The part of the proceeds belonging to the ward was the property referred to in the last-mentioned conversation. Mrs. Arminda Miller testifies that about 1873 or 1874 Mr. and Mrs. Snover were buying some millinery of her for the ward; that they asked the price, and, on its being given, said that they did not intend to charge the ward for those things; that they set them down but did not expect to charge her for them unless she did not live, in which case they would get pay out of her money for the things they got for her. Mr. Prall swears that in a conversation which took place between him and Mr. Snover, shortly before his marriage to the ward,

Snover *v.* Prall.

Mr. Snover said that her money had always been on interest, and that he had never made any charge against her for anything and never expected to make any. The evidence shows that the ward, from the time she went into the family of Mr. Snover, until her marriage, was treated in all respects as his own child, and did and was expected to do such work as she could about the house. Mr. Prall testifies that in the conversation before referred to, Mr. Snover said that they had brought her up to work; that she knew how to do all kinds of work as well as his wife did; that they had always brought her up as one of the family; that she was one of the family and he had always treated her as such, and that she had been of great use to his wife, and that, in fact, he did not know how they would get along without her. Mrs. Prall says Mrs. Snover told her, while as yet they were living on the farm, from which they removed to Blairstown in 1871, that she (Mrs. Prall) was in the place they would have to fill with a hired girl (that is, that but for her work they would be compelled to hire a servant), and she says that after the hired girl left (which appears to have been in December, 1869), Mrs. Snover and she together did all the work. Neither in his book nor in his first account did Mr. Snover make any charge against her for board. Mr. Snover's agreement with his ward's father, when he took her, that he would support her at his own cost, as his own child, and her services in his household, forbid the allowance of the charges excepted to for board, washing and mending, for the board of the seamstress and for the work of Mrs. Snover in sewing for the ward.

Nor does there appear to be any ground for the allowance of the counsel fee, to which exception was made; nor for the allowance of the charges for tuning the piano. There is no error in the directions of the decree on the subject of the charge of interest against the guardian. The decree appealed from will be affirmed, with costs, to be paid by the appellant out of his own funds.